UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

VERONICA M. KNIGHT,

          Plaintiff,

v.                                 CASE NO. 2:12-cv-526

CAROLYN W. COLVIN,
Acting Commissioner of
Social Security Administration,

          Defendant.

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff Veronica Knight ("Knight" or "plaintiff"), proceeding pro se, brought this action under 42 U.S.C. §§ 1383(c)(3) and 405(g) seeking judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying her claim for a period of disability insurance benefits ("DIB"), and supplemental security income ("SSI") under Title II and Title XVI of the Social Security Act. The case was referred to a United States Magistrate Judge for a Report and Recommendation pursuant to the provisions of 28 U.S.C. §§ 636(b)(1)(B) and (C) and Rule 72(b) of the Federal Rules of Civil Procedure. For the reasons stated below, the Court recommends that the decision of the Commissioner be affirmed.

## I. PROCEDURAL BACKGROUND

Plaintiff filed for DIB and SSI on October 20, 2009. (R. 137-144). Both applications alleged disability since January 13, 2009, due to a herniated disc, acid reflux, chronic stomach pain, tendonitis in her right hand and arm, high blood pressure and cholesterol. (R. 137, 141, 163). The Commissioner denied her application initially and upon reconsideration. (R. 47-64, 69-

1

86). On September 18, 2010, Knight requested a hearing before an administrative law judge ("ALJ") (R. 121-125), which was conducted August 16, 2011. (R. 14).

On August 31, 2011, Administrative Law Judge James J. Quigley found plaintiff was not disabled within the meaning of the Social Security Act, and denied her claim for DIB and SSI. (R. 14-24). Knight requested review by the Appeals Council, and offered additional medical evidence to support her request. (R. 9-10, 477-488). Her request for review was denied on July17, 2012 (R. 1-5), thereby making the ALJ's decision the final decision of the Commissioner.

Pursuant to 42 U.S.C. §§ 1383(c)(3) and 405(g), Knight filed this pro se action seeking judicial review of the Commissioner's final decision on her denied claim. This case is now before the Court to resolve the parties' cross-motions for summary judgment.

## II. FACTUAL BACKGROUND

Knight was born on July 18, 1972 and was 36 years old at the time of the alleged onset date of disability, and was therefore considered to be a "younger person" pursuant to 20 C.F.R. §§ 404.1563(c) and 416.963(c). She has a high school education and two years of college. (R. 33-34). Previous to her work limitations, Knight had past work experience as a housekeeper, a shipper, a custodian, a warehouse floral arranger, and an in-home care aide. (R. 22, 164, 172). She testified at the hearing that she worked full-time as an in-home care aide for her aunt for "about six to eight months" in 2009; (R. 34-35) well past her alleged onset date of January 13, 2009. (R. 16).

Among her disabling conditions, Knight had a long history of painful and heavy menstruation, despite treatment with birth control medication. (R. 316, 32, 324). On February 11, 2009, at Maryview Medical Center in Portsmouth, Virginia, Rachel D. Lee, MD performed a

laparoscopic hysterectomy and bilateral salpingo-oophorectomy on Knight to alleviate her menstruation related discomfort. (R. 217-19). At a March 9, 2009 examination, Dr. Lee stated Knight was "healing well," but expressed concern about possible development of a fistula. (R. 312).

As predicted, Knight developed a vesicovaginal fistula[1] and on May 4, 2009, James R. Auman, MD performed a successful transvesical closure of it. (R. 224-34). On May 22, 2009, Dr. Auman examined Knight and stated her fistula was closed and she was "doing quite well." (R. 257). At a June 10, 2009 visit with Dr. Auman, Knight complained of lower abdominal pain, bladder spasms, and intermittent leakage of a small amount of urine. (R. 255). Dr. Auman opined she was still healing, and recommended follow-up in 4 weeks. Id.

On July 9, 2009, Knight had a CT scan of her abdomen and pelvis to determine the source of her abdominal pain. (R. 242). Susan E. McKenzie, MD stated there was no evidence of a residual fistula, but observed a "water density mass consistent with a cyst." (R. 242, 305, 306). At a July 13, 2009 visit with Dr. Auman, Knight continued to complain of increasing abdominal pain and left upper quadrant discomfort. (R. 253). Dr. Auman examined her, but found nothing abnormal. Id. He reviewed the CT scan and noted the cyst. Id. On July 23, 2009, Knight reported left side abdominal pain and left upper quadrant pain and nausea to Dr. Lee. (R. 301). Once examined, her abdomen felt soft and non-tender. Id. Dr. Lee referred Knight to a GI for evaluation of her left upper quadrant pain and to a physical therapist for her abdomen. Id. Upon request, she prescribed Knight pain medication. Id.

---

[1] A vesicovaginal fistula is an abnormal connection between the bladder and the vagina. National Institutes of Health (NIH) website www.ncbi.nlm.gov/mesh/?term=vesicovaginal%20fistula.

On August 3, 2009, Maria T. Penalosa, a Physician Assistant (PA) with Gastrointestinal & Liver Specialists of Tidewater PLLC consulted Knight regarding her complaints of "sharp" and "constant" left upper quadrant abdominal pain.  (R. 235). PA Penalosa stated Knight's abdomen had normal consistency and bowel sounds, with no tenderness and masses. (R. 236). She stated Knight's pain was due to scar tissues and adhesions and recommended an upper GI endoscopy and colonoscopy to rule out other possible causes of her pain. (R. 237).

Knight began physical therapy for her abdomen and back pain on August 5, 2009. (R. 238). On August 6, 2009, Haywood H. Davis, MD at Harbour View Medical Center conducted a pelvic ultrasound which revealed a "trace amount of pelvic free fluid," but was otherwise unremarkable. (R. 298).  On August 29, 2009, Dr. Davis conducted another ultrasound on Knight's abdomen. (R. 240-41).  Dr. Davis stated the ultrasound images were "unremarkable." (R. 241).

On September 16, 2009,  Knight's primary care physician Nihar R. Bhowmilk, MD, completed a Commonwealth of Virginia Department of Social Services (DSS) medical evaluation for Knight[2] and opined she was unable to participate in employment and training activities in any capacity for at least 90 days. (R. 457).  Although the form had space to elaborate on the reasons why Knight was unable to participate, Dr. Bhowmilk did not complete this portion of the form.

On October 5, 2009, Knight saw Dr. Lee again with reports of abdominal and pelvic pain that "occur[ed] during intercourse." (R. 293). Dr. Lee stated Knight's abdomen and bladder were non-tender to palpation. (R. 295).  At Knight's October 12, 2009 visit to In Motion Physical

---

[2] Individuals seeking Temporary Assistance for Needy Families (TANF) are exempt from participation in employment and training activities with the consent of a treating physician. The medical evaluation form provided to physicians is a check-the -box form, which allows them to release individuals from participation for a specified time period.

Therapy, it was noted Knight was "inconsistent in performing [her] home exercise program." (R. 296). On a DSS medical evaluation dated November 16, 2009, Dr. Bhowmilk again opined Knight was unable to participate in employment for more than 60 days. (R. 459). On a January 18, 2010 evaluation, he increased her work restriction to 90 days. (R. 461).

On February 19, 2010, Knight had an x-ray which showed she had "tilt lumbar spine and moderate nearing L5/S1 disc space." (R. 276). At a February 25, 2010 visit with Dr. Auman, Knight complained of abdominal pain and a recent episode of hematuria. (R. 252). He recommended a cystoscopy to re-check her bladder to determine the cause. Id. On March 12, 2010, he performed a cystoscopy on Knight and stated no evidence of abnormalities of the lining of the bladder existed and the fistula was "successfully" closed. (R. 251).

On March 24, 2010, Dr. Bhowmilk completed a range of motion form and neurological evaluation for Knight. (R. 265-66). The range of motion form stated Knight had slightly decreased range of motion in her spine, shoulders, elbows, hips, and knees. Id. The neurological evaluation also stated Knight possessed normal 5/5 strength in both her upper and lower extremities. She also had completely normal measurements for coordination, gait, station, and reflexes. Id.

On April 13, 2010, during an exam with Dr. Lee, Knight complained of lower back pain, left upper quadrant pain, and leg pain. (R. 287, 338). However, Knight stated her pain was stable and had not become worse over the past year. Id. Dr. Lee observed no physical irregularities of Knight during her examination. (R. 288-89, 339-40). On a May 11, 2010 Virginia DSS medical evaluation form, Dr. Bhowmilk again opined Knight was unable to work for at least a period of six months. (R. 463). This time the form stated she could not lift or carry objects more than 10 pounds due to lumbar radiculopathy. He also stated she had been referred for future

5

appointments with an orthopaedist and neurologist. Id. At a May 25, 2010 visit with Dr. Bhowmilk, Knight complained of stomach and back pain. (R. 404). On June 21, 2010, Knight met again with Dr. Bhowmilk and stated she was having headaches and continued back pain. (R. 402).

On June 24, 2010, Ikshvanku A. Barot, MD evaluated Knight for her headaches. (R. 416). She reported three to four stress-related headaches over the past month each lasting several hours. Id. Dr. Barot diagnosed her with migraines and sleep apnea; and ordered an EEG, sleep study, and an MRI. (R. 418). On July 8, 2010, Dr. Barot stated Knight's EEG was within normal limits; while her MRI was still pending. (R. 421). His physical examination revealed Knight had normal range of motion and no pain in her spine and all extremities. Id. His diagnoses were obesity, sleep apnea, and headaches. Id. Dr. Barot advised Knight of the "need to lose weight," because obesity can affect sleep apnea. Id.

On October 28, 2010, Knight had a lumbar spine MRI for her back pain at Sentara Obici Hospital. (R. 455). Ramandoop Singh, MD evaluated it and reported Knight had degenerative disc disease "with a diffuse broad-based disc bulge and a superimposed right lateral recess disc extrusion at L5—S1 level," and mild spondylosis at L3-4 and L4-5 levels with mild bilateral foraminal stenosis. (R. 456). On November 4, 2010, Wayne T. Johnson, MD examined Knight for her complaints of back pain and lower extremity pain. (R. 361). He referred her to Virginia Orthopaedic and Spine Specialists for an evaluation of her pain symptoms. Id.

On November 9, 2010, Nickolas Pezzella, MD of Virginia Orthopaedic and Spine Specialists evaluated Knight for her complaints of chronic low back pain. (R. 358). Knight stated that the pain extended circumferentially into her left leg down to her ankle. Id. Upon examination, Dr. Pezzella opined Knight was not in any "apparent distress and [was] alert and

oriented x 3," and stated she had 4+/5 strength throughout both lower and upper extremities, full range of motion, with a negative bilateral straight leg raise test and Hoffman test. (R. 359, 451). Dr. Pezzella reviewed her MRI and observed her degenerative disc disease with a "diffuse broad-based disc bulge and a superimposed right lateral disc extrusion at L5-S1." Id. In addition, he stated she had mild spondylosis at L-3-L4 and L4-L5. Id. Dr. Pezzella increased Knight's Topamax and recommended a selective nerve block, which was performed November 23, 2010, to alleviate her reported pain. (R. 357).

On November 16, 2010, Knight returned to Dr. Bhowmilk again with symptoms of back pain. (R. 390). On Knight's Virginia DSS medical evaluation form, Dr. Bhowmilk again opined she would not be able to work for the next six months. (R. 465). This time the report described her disability as unspecified physical limitations related to "herniated lumbar disc and spondylosis." (R. 466).

Thomas Duntemann, MD, of Gastrointestinal & Liver Specialists of Tidewater PLLC examined Knight on December 1, 2010, following an ER visit for three days of midsternal and left chest pressure. (R. 370). He opined the source of her pain was probably musculoskeletal, and ordered a CT scan of her abdomen and pelvis. (R. 371). At Knight's December 8, 2010 appointment with Dr. Pezzella, she reported no pain relief following her nerve block, and was experiencing pain in her left leg as well. (R. 354). She reported an insurance problem and had not yet increased her Topamax as he prescribed. Id. Dr. Pezzella recommended a bilateral lower extremity EMG, and advised Knight to take her Topamax as prescribed. Id. On Knight's December 22, 2010 visit with Dr. Pezzella, she reported paresthesias in her face and arms, which is a side effect of Topamax. (R. 352). Upon examination, Dr. Pezzella observed that her

7

previously noted limitations remained the same and had not worsened. Id. Dr. Pezzella prescribed Lyrica for Knight's pain in lieu of the Topamax. Id.

In early January, it appears Dr. Auman performed a cystoscopy on Knight, which revealed a small hemangioma, which was then cauterized and obliterated. (R. 426). At a January 14, 2011 visit with Dr. Auman, Knight stated she had continued chronic abdominal pain. (R. 426). Dr. Auman observed no evidence of infection in Knight's urine, but a CT scan earlier in the month revealed a possible ovarian cyst. Id. Knight planned to see Dr. Lee regarding the cyst. Id. On a January 18, 2011 visit with Dr. Lee, Knight reported pelvic pain, bowel movement pain, and pain with urination. (R. 342). Dr. Lee examined Knight, and she appeared normal. (R. 344). Dr. Lee ordered another ultrasound to evaluate her pelvic cyst. Id.

On February 2, 2011, Dr. Pezzella again examined Knight for her chronic low back and left leg pain. She reported her pain had worsened, and was a 10/10. (R. 350). Dr. Pezzella examined her and was unable to find objective evidence of her extreme pain. He observed that she was in no apparent distress, demonstrated 4+/5 throughout both lower extremities and had a negative straight leg raising test. Id. He prescribed a TENS unit trial in an attempt to lessen her reported pain. Id.

On February 7, 2011, Stacey Rogers, MD, at Virginia Oncology Associates saw Knight after a referral from Dr. Lee regarding her pelvic cyst and chronic abdominal pain. (R. 430). Dr. Rogers diagnosed Knight with an ovarian cyst, opined it most likely represented a benign process, but recommended surgery due to her "significant pain and persistence of her pain." (R. 431). On February 22, 2011, it appears Knight had a laparoscopic left salpingo-oophorectomy at Chesapeake Regional Medical Center. (R. 427).

Knight saw Dr. Duntemann on March 24, 2011, for her left upper quadrant abdominal pain. (R. 368). He opined that she suffered from esophageal reflux, but observed nothing that could cause her abdominal pain. (R. 369). A March 31, 2011, EGD was mostly unremarkable, with results consistent with non-erosive gastritis. (R.366). On an April 7, 2011 visit with Dr. Auman, Knight complained of "recurrent episodes of hematuria," and upper abdominal pain which interfered with her ability to work. (R. 425). Dr. Auman observed no infection and diagnosed "Gross hematuria-resolved" and "Benign inflammatory changes." Id.

On April 11, 2011 Knight saw Katherine Caton, NP at Virginia Oncology Associates to follow up with her surgery from February 2011. (R. 427). Knight reported "some" abdominal pain, but is unsure if it is from surgery or her stomach issues. Id. Nurse Caton reported Knight was completely healed from her surgery. (R. 428). However, Knight saw Dr. Lee on April 14, 2011 and complained of upper abdominal pain. (R. 345-46). Dr. Lee opined that it was probably due to a recently diagnosed stomach infection, and advised her to follow up with her GI. Id.

At a May 17, 2011 visit with Dr. Pezzella, Knight again complained of chronic low back pain extending to the "left lower extremity." (R. 348). She stated she returned her TENS unit, because she experience no pain relief. Id. In fact, Knight reported a pain increase since her last visit with Dr. Pezzella. Id. Again, her physical exam revealed no apparent distress, 4+/5 strength in both legs and a negative straight leg raising test. She requested a lumbar block for her pain, because she experienced relief from them in the past. Id. Dr. Pezzella referred her for a lumbar block for her pain. Id.

Knight met with Dr. Bhowmilk on May 18, 2011 and reported painful urination, black tarry stool, depressive mood, headache, and lower back pain. (R. 372). Dr. Bhowmilk stated she had epigastric tenderness, and "tenderness on low back with decreased range of motion." (R.

374). Additionally, on another DSS medical evaluation, he opined Knight was unable to work for the next three months, due to Lumbago. (R. 468). On May 31, 2011, Knight had a lumbar epidural for her back pain and tolerated the procedure well. (R. 439). On June 14, 2011, Knight reported to Dr. Pezzella that she had right-side back pain and continued "left lower extremity pain at 10/10." (R. 347).

On August 1, 3, and 4, 2011, Knight underwent a functional capacity evaluation at Physical Therapy Works in Suffolk, VA. (R. 469). Tory Bishop, PT, opined Knight was able to do at least sedentary work in regards to material handling. (R. 469). She also stated Knight could occasionally sit, stand, walk, climb stairs, squat, and could frequently reach; but was unable to bend, kneel, crawl or climb ladders. Id. However, the validity of the FCE was considered "equivocal," as Bishop found evidence of symptom exaggeration and inappropriate illness behavior. (R. 471).

On October 19, 2011, Rajiv B. Nanavaty, MD conducted an EMG and a nerve conduction velocity examination on Knight. (R. 481). Both yielded results within normal limits. Id. On November 7, 2011, Knight was treated at the Sentara Obici Emergency Department for her chronic back pain. (R. 484). The emergency doctor opined that her back pain was likely musculoskeletal, as she was "neurologically intact" and presented with no other findings. (R. 485).

At the hearing before the ALJ on August 31, 2011, Knight, who was then represented by counsel, testified that she worked 40 hours per week as an in-home care aide for her aunt in 2009. (R. 34-35). She stated she was still able to perform household chores, like shopping for groceries and fixing meals, with the help of her children. (R 37). Knight attended church twice a

month, and was transported there in a church van. (R. 38). She also testified she spent the majority of her day sitting in a recliner sleeping and watching TV to alleviate her pain. (R. 39).

### III. STANDARD OF REVIEW

In reviewing a decision of the Commissioner denying benefits, the Court is limited to determining whether the decision was supported by substantial evidence on the record and whether the proper legal standard was applied in evaluating the evidence. 42 U.S.C. § 405(g) (2008); Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam); Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. of N.Y. v. NLRB, 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla" of evidence, but may be somewhat less than a preponderance. Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966).

In reviewing for substantial evidence, the Court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996); Hays, 907 F.2d at 1456. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Commissioner (or the [Commissioner s] designate, the ALJ)." Craig, 76 F.3d at 589. The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed. Perales, 402 U.S. at 390. Thus, reversing the denial of benefits is appropriate only if either the ALJ's determination is not supported by substantial evidence on the record, or the ALJ made an error of law. Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## IV. ANALYSIS

To qualify for a period of disability and disability insurance benefits under sections 216(i) and 223 of the Social Security Act, 42 U.S.C. §§ 416(i) and 423, an individual must meet the insured status requirements of these sections, be under age sixty-five, file an application for disability insurance benefits and a period of disability, and be under a "disability" as defined in the Act.

To be eligible for SSI payments under Title XVI of the Act, the claimant, in addition to satisfying the income and resource requirements in 42 U.S.C. § 1382(a) and 42 U.S.C. § 1382(b), must also satisfy the basic eligibility and definitional requirements for disability found in 42 U.S.C. § 1381(a) and 42 U.S.C. § 1382(c).

The Social Security Regulations define "disability" as the:

> inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

20 C.F.R. § 404.1505(a); see also 42 U.S.C. §§ 423(d)(1)(A) and 416(i)(1)(A). To meet this definition, a claimant must have a "severe impairment" which makes it impossible to do previous work or any other substantial gainful activity that exists in the national economy. 20 C.F.R. § 404.1505(a); see 42 U.S.C. § 423(d)(2)(A).

The regulations promulgated by the Social Security Administration provide that all material facts will be considered in determining whether a claimant has a disability. The Commissioner follows a five-step sequential analysis to ascertain whether the claimant is disabled. The five questions which the ALJ must answer are:

1.    Is the individual involved in substantial gainful activity?

2.    Does the individual suffer from a severe impairment or combination of

impairments which significantly limit his or her physical or mental ability to do work activities?

3.     Does the individual suffer from an impairment or impairments which meet or equal those listed in 20 C.F.R., Pt. 404, Sbpt. P, App. 1 (a "listed impairment" or "Appendix 1")?

4.     Does the individual's impairment or impairments prevent him or her from performing his or her past relevant work?

5.     Does the individual's impairment or impairments prevent him or her from doing any other work?

An affirmative answer to question one, or a negative answer to question two or four, results in a determination of no disability. An affirmative answer to question three or five establishes disability. This analysis is set forth in 20 C.F.R. §§ 404.1520 and 416.920. The burden of proof and production rests on the claimant during the first four steps, but shifts to the Commissioner on the fifth step. Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995) (citing Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992)).

"When proceeding through this five step analysis, the ALJ must consider the objective medical facts, the diagnoses or medical opinions based on these facts, the subjective evidence of pain and disability, and the claimant's educational background, age, and work experience." Schnetzler v. Astrue, 533 F. Supp. 2d 272, 286 (E.D.N.Y. 2008). At all steps the ALJ bears the ultimate responsibility for weighing the evidence. Hays, 907 F.2d at 1456.

## A.    ALJ's Decision.

In the present case, the ALJ made the following findings under the five part analysis: (1) The ALJ found Knight engaged in substantial gainful activity from the alleged onset date of January 13, 2009 through August 1, 2009; (2) Knight had several severe impairments: laparoscopic hysterectomy with subsequent vasicovaginal fistula in 2009, status post multiple abdominal surgeries; degenerative disc disease, disc bulge and disc extrusion at L5-S1 with mild

spondylosis at L3-4 and L4-5; associated left leg pain; and hernia; (3) she did not have an impairment (or combination of impairments) that met or equaled the severity of one of the listed impairments in Appendix 1; (4) Knight was unable to perform her past relevant work, but had the RFC to perform a limited range of light work, including lifting up to 20 pounds occasionally and 10 pounds frequently and could stand/walk for up to six hours and sit for at least six hours; and (5) considering Knight's age, education, work experience, and residual functional capacity, and relying on the Medical Vocational Guidelines as a framework, there were jobs that existed in significant numbers in the national economy that she could perform. (R. 16-22). In Knight's two page pro se Motion for Summary Judgment, she disputes the ALJ's finding that she is not disabled. She believes she is unable to work and offers additional evidence to support this assertion. The Court will address both of these arguments.

**B.** **Substantial evidence supports the ALJ's decision that Knight is not disabled.**

To begin with, Knight has not proffered any argument or evidence to challenge the ALJ's finding that she engaged in substantial gainful activity through August 1, 2009. As a result, the relevant period under analysis is August 2009 through the date of the decision on August 16, 2011. Although Knight underwent extensive treatment during this period, the ALJ carefully analyzed her medical record and explained the weight assigned to each medical opinion. Importantly, Knight's pleadings have not directed the Court to any particular record or opinion which she claims the ALJ failed to consider or weighed improperly. Nevertheless, considering her pro se status, the undersigned has reviewed the entire record and the ALJ's opinion and finds the denial is supported by substantial evidence.

Knight's general claim that she is disabled is best analyzed as a challenge to the ALJ's RFC finding. At step four of the sequential analysis, the ALJ must first determine the claimant's

14

RFC, which is the claimant's maximum ability to work despite his limitations. 20 C.F.R. §§ 404.1545(a) and 416.945(a)(1). The ALJ must consider all of claimant's impairments, including impairments that are not severe. 20 C.F.R. §§ 404.1545(a)(2) and 416.945(a)(2). The ALJ then uses the RFC to determine whether the claimant can perform his past relevant work. Id. at § 404.1545(a)(5)(i). The determination of RFC is based on consideration of all relevant medical and other evidence in the record. 20 C.F.R. §§ 404-1545(a)(3) and 416.945(a)(1).

At step five of the sequential evaluation process, the ALJ is required to consider the claimant's RFC, together with her age, education and work experience to determine if the claimant can make an adjustment to other work that exists in the national economy. 20 C.F.R. §§ 404-1520(g), 416.920(g).  To make this finding, the ALJ may, in appropriate cases, rely on the Medical-Vocation Guidelines, which uses the above factors to make a determination of whether claimant is "disabled" or "not disabled." 20 C.F.R. §§ 404.1569 and 416.969; 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200(a).  Where the claimant's RFC places them between exertional levels, the Grid Rules are used as a framework to aid in the decision process.

In the present case, the ALJ carefully considered the entire record and opined Knight had the RFC to perform less than the full range of light work. (R. 19). He then considered her age, education, work experience and RFC, and found that the postural limitations he imposed in addition to the limit to light exertional work would not significantly erode the light occupational base, and thus, there were jobs that existed in the national economy that she could perform. (R. 22).

In determining Knight's RFC, the ALJ had to consider all of her symptoms, including her pain, and the extent to which her symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. 20 C.F.R. §§ 404.1529(a) and 416.929(a).  The

ALJ must also consider the medical opinions of a claimant's treating physicians and the non-examining consultants when making the RFC determination. 20 C.F.R. § 416.927(c). Generally, the opinion of a treating physician is accorded more weight than that of a non-examining consultant. Id. Under the federal regulations and Fourth Circuit case law, a treating physician's opinion merits "controlling weight" if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." Id. at §§ 416.927(c)(2) and 404.1527(c)(2). Conversely, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Craig, 76 F.3d at 590. When the evidence is such that reasonable minds could differ as to whether a claimant is disabled, the ALJ, and ultimately the Commissioner, must resolve any inconsistencies in the evidence. Johnson v. Barnhart, 434 F. 3d 650, 653 (4th Cir. 2005). The ALJ must express "good reasons" for his decision as to the weight accorded to the opinion of a treating source. 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2). When an ALJ issues a not fully favorable decision to a claimant, the decision must contain

> the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

SSR 96-2P, 1996 WL 374188, at *5 (S.S.A.). The ALJ must indicate the weight given to all considered evidence, otherwise the reviewing court is unable to determine if the ALJ's findings are supported by substantial evidence. Gordon v. Schweiker, 725 F. 2d 231, 235-36 (4th Cir. 1984).

Here, the ALJ adequately explained the weight given to Knight's testimony, as well as to

the opinion evidence, and objective medical evidence including treatment notes from all of her medical sources. As a result, his finding that Knight possessed the residual functional capacity to perform less than the full range of light work was supported by substantial evidence in the record.

With regard to her testimony, Knight testified that her frequent back pain constantly extended into her leg and her neck. (R. 36). She also testified that she had fatigue and had to "lay down a whole lot." Id. Knight stated that she spent most of her day sitting and sleeping in a recliner with her feet up. (R. 39). Though the ALJ considered Knight's testimony regarding her limitations, it alone is not enough to establish disability. 20 C.F.R. §§ 404.1529(a) and 416.929(a). In considering a claimant's limitations or symptoms, the ALJ must follow a two-step process established under both federal regulations and Fourth Circuit precedent. First, the ALJ must determine if the claimant can show, by objective medical evidence, a physical impairment that could reasonably produce the claimant's symptoms. 20 C.F.R. § 416.929(b); Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996).

After the first step has been satisfied, the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms and the extent by which they affect the claimant's ability to work. 20 C.F.R. §§ 404.1529(c)(1) and 416.929(c)(1). Here, the ALJ found that Knight's medically determinable impairments could reasonably be expected to cause her alleged symptoms, but Knight's statements regarding the intensity, persistence, and limiting effects of these symptoms were not consistent with the record as a whole. (R. 20).

With regard to her persistent complaints of abdominal pain, the objective evidence supports the ALJ's finding that Knight's statements regarding the severe limitations imposed by her symptoms were inconsistent with the record as a whole. Following her hysterectomy and

17

subsequent closure of her vesicovaginal fistula, Knight complained repeatedly of left upper quadrant pain and pelvic pain. (R. 253, 255). But Dr. Auman opined she was healing well, and the pain stemmed from her recovery. Id. A July 2009 CT scan of Knight's abdomen and pelvis revealed a mass consistent with a cyst, but otherwise Knight appeared normal. (R. 242, 253, 306). In late July 2009, Dr. Lee was unable to find evidence of anything causing her symptoms. (R. 301). Physician Assistant Penalosa examined Knight in early August for her left upper quadrant pain, and again her exam was within normal limits. (R. 236). An August 6, 2009 ultrasound was "unremarkable" and "no pelvic mass is demonstrated." (R. 298). An August 29, 2009 ultrasound was also "unremarkable." (R. 241).

Despite Knight's repeated complaints of abdominal pain, her treating physicians were unable to find objective evidence to support her symptoms. After her hysterectomy and fistula closing, each doctor who examined her opined that she was healed from her surgeries and struggled to find the cause of her reported pain (R. 242, 253, 255). Due to her repeated and insistent complaints of pain, Knight had extensive testing; all of which revealed unremarkable findings. (R. 242, 298, 241, 251).

In March 2010, in response to Knight's continued complaints of pain, she had a cystopscopy. (R. 251). Dr. Auman stated she appeared normal and her fistula was completely closed. Id.   Throughout 2010, Knight continued to complain of left upper quadrant pain, stomach pain, and pelvic pain. (R. 287, 370, 404 ). It appears that Knight had her left fallopian tube and ovary removed in February 2011 due to an ovarian cyst. (R. 427). Dr. Rogers had opined it was probably benign, but recommended surgery due to Knight's significant and persistent pain. (R. 431). Four days later, NP Caton stated that Knight was completely healed from the surgery. Knight reported she was still in some pain but she was unable to ascertain the

source. (R. 427).  The ALJ considered all of this evidence in concluding that the abdominal conditions, while serious, did not result in "lasting functional limitations," but instead were fully addressed by appropriate treatment methods. (R. 21).

With regard to her complaints of lower back pain and the limitations imposed by Dr. Bhowmilk, the ALJ's decision adequately explained the limited weight given to Knight's primary care physician.  He noted that Dr. Bhowmilk opined on several DSS medical evaluations in 2009, 2010, and 2011 that Knight was unable to participate in employment and training activities in any capacity during the time period following his evaluation, ranging from 60 days to 6 months. (R. 21).  Sometimes these limitations were attributable to Knight's complaints of back pain.  The ALJ gave Dr. Bhowmilk's evaluations minimal weight, because they were not consistent with the treatment prescribed and objective evidence in the record.  Id.  Similarly, Knight's functional capacity evaluation by Tory Bishop, PT was given minimal weight, due to Bishop's observations that Knight engaged in symptom exaggeration and inappropriate illness behavior; and that the overall report was "equivocal." Id.

The ALJ's decision to partially credit Knight's complaints regarding severe and disabling back pain is supported by substantial evidence in the medical record.  She started physical therapy for her back pain in August 2009, but was not regularity performing her exercises. (R. 238, 296).  Dr. Singh evaluated Knight's October 2010 MRI and diagnosed her with a diffuse broad-based disc bulge and a superimposed right lateral recess disc extrusion at L5—S1 level," and mild spondylosis at L3-4 and L4-5 levels with mild bilateral foraminal stenosis. (R. 456). In November 2010, Dr. Pezzella examined Knight and stated that she was no apparent distress, appeared alert and oriented, and possessed 4+/5 strength throughout both her lower and upper extremities, while a bilateral straight leg test and Hoffman test were both negative. (R. 359).  In

response to Knight's complaints of pain, Dr. Pezzella increased her pain medication and performed a nerve block. (R. 359, 357). Despite his efforts, Knight continued to report an increase of pain. (R. 354). Yet Dr. Pezzella observed no change to Knight's limitations that may have explained her increased pain. Id. By February 2011, Knight reported a pain level of 10/10, but Dr. Pezzella again failed to discover the source of her discomfort. (R. 350). In May, Knight stated a prescribed TENS unit offered her no relief and her pain had worsened and extended to her lower left extremity. (R. 348). Again, Dr. Pezzella found no objective evidence to explain her complaints of increased pain. Id. Knight had a lumber block in May 2011, but she continued to complain that her leg pain was 10/10. (R. 347). Although Dr. Pezzella pursued several pain relief treatments with Knight, she persistently reported severe pain. He was unable to pinpoint the cause of her complaints. As the ALJ observed, despite Knight's consistent complaints of pain, Dr. Pezzella's records continually showed rather benign objective findings that Knight was consistently in no apparent distress, had full strength, and other negative test results. (R. 21, 359, 451). In combination with her continued employment during the period of alleged disability these observations further undermined Knight's credibility with respect to her symptoms.

The ALJ also considered a range of motion form and neurological evaluation completed by Dr. Bhowmilk that showed Knight had only a slightly limited range of motion, but possessed normal strength. (R. 20, 265-66). The ALJ also noted Knight was inconsistent in her reports of symptoms to her various doctors. (R. 21). For example, the ALJ observed that Knight did not report any joint pain to Dr. Barot during his examination and her range of motion was normal. Id. Finally, although he discounted Knight's complaints of severe and disabling pain, the ALJ nonetheless fashioned a restrictive RFC, limiting Knight to light exertional work with postural limitations. He went on to observe that the postural limitations he imposed would not

significantly erode the light occupational base.  Throughout the period under review Knight was a younger person, only 36 on the date of her alleged onset, whose age would not seriously affect her ability to adjust to other work.  20 C.F.R. §§ 404.1563, 416.963.  Therefore, as a younger person, using the Grid Rules as a framework, the ALJ made a finding that there are jobs in the national economy which she could perform.  This finding is also supported by substantial evidence.

## C.    The new evidence Knight proffers does not warrant remand.

The Commissioner's decision is conclusive if it is supported by substantial evidence.  42 U.S.C. §405(g).  A court has the power to enter a judgment affirming, modifying, or reversing the decision of the Commissioner, with or without remand; and may also remand a case "upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding."  Id.

Knight's motion for summary judgment includes additional medical records from 2012, an undated letter from Dr. Auman and a November 6, 2012 letter from Dr. Lee, and a January 9, 2011 medical record from Dr. Auman.  It does not appear that these medical records were submitted to the Appeals Council, but are presented for the first time to this Court.  In order to permit remand based on evidence not presented during the administrative process, Knight must show good cause for failing to present it and that the evidence is new and material.  42 U.S.C. § 405(g). Regardless of cause, only "new and material" evidence warrants remand.  Meyer v. Astrue, 662 F.3d 700, 705 (4th Cir. 2011).  The new evidence must "relate to the period on or before the date of the [ALJ's] hearing decision."  Id.  To be material, it must not be simply duplicative or cumulative, and present "a reasonable possibility that the new evidence would have changed the outcome."  Id. (citing Wilkins v. Sec'y Dept. of Health & Human Servs., 953

F.2d 93, 96 (4th Cir. 1991) (en banc.)).

The new evidence Knight submits from 2012 is not material because it documents her treatment in 2012, which is outside the August 2009 to August 2011 time period considered by the ALJ. Moreover, the letters from Dr. Auman and Dr. Lee are not new or material evidence, because they simply summarize Knight's medical history and reports of pain from physicians whose records were reviewed in detail by the ALJ. Finally, the January 9, 2011 medical record from Dr. Auman documents a hospital admission for a cystoscopy that was already sufficiently discussed in the record (R. 426), accordingly none of the newly disclosed evidence is material to the outcome of Knight's case and no remand is necessary to consider the new records.

## V. RECOMMENDATION

For the foregoing reasons, the Court recommends that Knight's motion for summary judgment be DENIED, that the Commissioner's motion for summary judgment be GRANTED, and that the final decision of the Commissioner be AFFIRMED.

## VI. REVIEW PROCEDURE

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.    Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this Report to the objecting party, 28 U.S.C. § 636(b)(1)(C), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.

2.    A district judge shall make a de novo determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this Court based on such findings and recommendations. Thomas v. Arn, 474 U.S. 140 (1985); Carr v. Hutto, 737 F.2d 433 (4th Cir. 1984); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

/s/

Douglas E. Miller
United States Magistrate Judge

DOUGLAS E. MILLER
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia

September 26, 2013

## Clerk's Mailing Certificate

A copy of the foregoing Report and Recommendation was mailed this date to each of the following:

Veronica Knight
1054 Cogic Square
Suffolk, VA 23434

Joel Eric Wilson
United States Attorney Office
101 W. Main St.
Suite 8000
Norfolk, VA 23510

Fernando Galindo, Clerk

By_____

Deputy Clerk

_____, 2013

24